2009 Ark. 259

**UNION PACIFIC RAILROAD; Herbert C. Stuart; Rodney Wayne Woods; and Ronnie Charles Glover, Appellants,**

v.

**Victor S. VICKERS; Robert Udell, Administrator of the Estate of Tracey Udell, Deceased; and James Freeman, Individually and on Behalf of All Other Persons Similarly Situated, Appellees.**

No. 08–934.

Supreme Court of Arkansas.

May 7, 2009.

Bryan Cave LLP, by: John Michael Clear, Elizabeth C. Carver, Daniel M. O'Keefe, and James R. Wyrsch; Patton Roberts, PLLC, by: Sean F. Rommel; and Friday, Eldredge & Clark, by: Robert S. Shafer, Kevin A. Crass, and Scott H. Tucker, Little Rock, for appellants.

Duncan Firm, P.A., by: Phillip J. Duncan, and James H. Bartolomei, Little Rock; Davis Bethune & Jones, by: Thomas C. Jones and Jose M. Bautista, Kansas City, MO; Roberts Law Firm, P.A., by: Richard Quintus and Mike Roberts, Little Rock; Brian G. Brooks; Dodson & Shaw, by: Nelson Shaw; and Law Office of Danny Cook, by: Danny J. Cook, Texarkana, TX, for appellees.

Welch and Kitchens, LLC, by: Morgan E. Welch, North Little Rock, for amicus curiae Arkansas Trial Lawyers Association.

Lax, Vaughan, Fortson, McKenzie & Rowe, P.A., by: Roger D. Rowe, Little Rock, for amicus curiae Association of American Railroads.

National Chamber Litigation Center, Inc., by: Robin S. Conrad; Winston & Strawn LLP, by: Gene C. Schaerr, Steffen N. Johnson, Andrew C. Nichols, and Jacob R. Loshin; Williams & Anderson PLC, by: Jess Askew III, Little Rock, for amici curiae the Chamber of Commerce of the United States of America, the Arkansas State Chamber of Commerce, and the Associated Industries of Arkansas, Inc.

Quattlebaum, Grooms, Tull & Burrow PLLC, by: Steven W. Quattlebaum, Michael N. Shannon and Jennifer L. Wethington, Little Rock, for amicus curiae the Product Liability Advisory Council, Inc.

ELANA CUNNINGHAM WILLS, Justice.

This is an interlocutory appeal from a class certification order entered by the Lafayette County Circuit Court on April 16, 2008. Appellee Victor S. Vickers was injured in a collision with a Union Pacific train on December 31, 2001; appellee Robert Udell is the father of Tracey Udell, who died as the result of injuries sustained

in a collision with a Union Pacific train in 1999; and appellee James Freeman suffered injures in a 1998 collision with a Union Pacific train. Vickers, Udell, and Freeman all entered into settlement agreements with Union Pacific whereby they released Union Pacific from any future claims.

On February 14, 2005, Vickers and Udell filed a class-action complaint against Union Pacific Railroad ("Union Pacific") and several of Union Pacific's employees.[1] The complaint alleged that, shortly after the accidents described above, Union Pacific sought out the injured individuals in order to settle their claims and release Union Pacific from liability. The complaint further alleged that Union Pacific informed the injured persons that they should not hire an attorney; that getting an attorney would cause delay; that obtaining the advice of an attorney would not benefit them; and that an attorney would cost them more than it would benefit them. In addition, the plaintiffs asserted that, by developing a relationship of confidence and trust with the injured parties, Union Pacific gained a position to exercise influence over them and used that position to settle its claims with the accident victims for amounts lower than the fair and reasonable value of the claims.

In the complaint, the plaintiffs asserted that Union Pacific had made similar representations to all the members of the proposed class, which consisted of those individuals who had settled claims with Union Pacific "as a result of [Union Pacific's] fraudulent concealment, misrepresenta-

tion, and/or concealment of material facts that would have caused class members to not settle for the amount settled for and/or to retain an attorney independent of [Union Pacific] to represent his interests." The complaint asserted that there were questions of law and fact common to all class members, including, among others, the questions of whether Union Pacific engaged in business practices of settlement that violated the Arkansas Deceptive Trade Practices Act (ADTPA) and whether Union Pacific and the individual defendants had illegally practiced law.[2]

Union Pacific first moved to dismiss the complaint on March 18, 2005, arguing that, because the plaintiffs' claims were barred by their releases, the complaint failed to state facts upon which relief could be granted. Union Pacific also asserted that the complaint did not state a claim under the ADTPA because the plaintiffs were not consumers and that it failed to state facts supporting a claim for the unauthorized practice of law. The circuit court denied Union Pacific's motion to dismiss on January 16, 2007.

The plaintiffs filed their motion for class certification on June 1, 2007. In this motion, they argued that Union Pacific engaged in the same pattern of conduct with respect to each putative class member, and that this common "unlawful course of conduct and practice" warranted certification as a class action. Noting that a common course of conduct generally defeats individual issues regarding causation and damages, the plaintiffs urged that their

---

1. James Freeman was added as a named plaintiff in an amended complaint filed on April 5, 2007. The named defendants are employees of Union Pacific: Herbert Stuart is director of Union Pacific's claims department; Rodney Woods is a claims manager for Union Pacific; and Ronnie Glover is a claims adjuster for Union Pacific.

2. The complaint initially listed five causes of action: fraudulent concealment and material misrepresentation; violations of the ADTPA; illegal practice of law; negligence; and conversion. At the hearing on the class-certification motion, the plaintiffs amended their pleadings to reflect only the unauthorized-practice-of-law and ADTPA claims.

claims were founded on a common fraudulent scheme or plan used by Union Pacific to settle claims with injured individuals for less than the fair value of those claims.

Union Pacific responded on July 2, 2007, asserting that there was no common pattern in conducting settlement negotiations and that each settlement negotiation was "individual and unique," turning on oral discussions that were different for every putative class member. Union Pacific further argued that, despite extensive discovery, the plaintiffs' motion for class certification was "bereft of any mention of any facts establishing any common pattern or predominant classwide issue suitable for class treatment." Further, Union Pacific contended that the proposed class "depend[ed] on individual determinations on a case-by-case basis as to whether someone is in or out of the proposed class." Thus, the claims were not suitable for class treatment "because each cause of action requires individual fact-finding as to the content of oral discussions between hundreds of different claimants and at least twenty different UP claims representatives." In the absence of a predominant issue that was common to the entire class, Union Pacific argued, class certification was inappropriate.

The circuit court held a hearing on the plaintiffs' class-certification motion in October 2007. At that time, the plaintiffs altered the definition of their class and proposed a set of common issues of law and fact. On April 16, 2008, the circuit court entered an order granting class certification. In its order, the court adopted the precedent submitted by the plaintiffs and made numerous factual findings. Among them, the court found that, in approximately 1992, Union Pacific established, as part of a uniform company-wide policy and practice, a claims resolution system to settle claims and potential claims

against it. The court found that the company trained its claims representatives in handling claims, and its policy was to contact injured persons within twenty-four to forty-eight hours of the incident to initiate the settling of claims against the company. The court further found that, as part of the settlement process, Union Pacific would prepare a release and obtain the injured person's signature on it. Additionally, the court determined that the result of this process was Union Pacific's "obtaining substantial economic benefits by saving money on the amount of claims paid out, avoiding additional litigation expenses ... [and] obtaining full releases from class members for settlement amounts typically and significantly less than the value of a claimant's claim."

In certifying the class, the court determined that the plaintiffs had satisfied each of the requirements of Ark. R. Civ. P. 23. The court found that the class would have approximately three hundred members, so the numerosity requirement had been satisfied. The court also determined that the plaintiffs had satisfied the commonality requirement, declaring that there were five questions of fact or law common to all members of the class:

1. Did Defendants prepare or fill in legal documents?
2. Did Defendants select and/or complete legal instruments?
3. Did Defendants advise claimants regarding legal rights?
4. Did Defendants engage in the unauthorized practice of law?
5. Did Defendants engage in deceptive trade practices under the Arkansas Deceptive Trade Practices Act?

The court also found that the representatives' claims were typical of those of the class, and that the named representatives were adequate to represent the class. Finally, the court found that the common

issues predominated over any individual questions and that a class action was the superior method for handling the matter. Accordingly, the court certified the class consisting of "[a]ll unrepresented, non-railroad-employee citizens of Arkansas who settled personal injury or wrongful death claims with Union Pacific from 1992 to February 14, 2005."

On appeal, Union Pacific challenges the trial court's ruling regarding only three of the Rule 23 requirements: commonality, predominance, and adequacy. In addition, Union Pacific assigns two other points of error, contending that 1) the circuit court's order made findings of fact that were unsupported by the record, and 2) the court abused its discretion by including in the class plaintiffs whose settlements had previously been approved by a probate court.[3]

We have held that circuit courts are given broad discretion in matters regarding class certification and that we will not reverse a circuit court's decision to grant or deny class certification absent an abuse of discretion. *See Ga.-Pac. Corp. v. Carter,* 371 Ark. 295, 265 S.W.3d 107 (2007); *Beverly Enters.–Ark., Inc. v. Thomas,* 370 Ark. 310, 259 S.W.3d 445 (2007). When reviewing a circuit court's class-certification order, we review the evidence contained in the record to determine whether it supports the circuit court's decision. *Ga.-Pac., supra.* We have stated:

> [T]he issue of whether to certify a class is not determined by whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. We have also observed that it is totally immaterial whether the petition will succeed on the

merits or even if it states a cause of action. An order denying or granting class certification is separate from the merits of the case. Although we do not delve into the merits of the underlying claims in a potential class-action case, we will review the trial court's order to determine whether the requirements of Rule 23 are satisfied.

*Am. Abstract & Title Co. v. Rice,* 358 Ark. 1, 186 S.W.3d 705 (2004) (internal citations omitted).

Rule 23 of the Arkansas Rules of Civil Procedure governs class actions and class certification. The rule provides, in pertinent part, as follows:

> (a) Prerequisites to Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties and their counsel will fairly and adequately protect the interests of the class.

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

This court has reviewed the provisions of Rule 23 on numerous occasions and has

---

**3.** Union Pacific does not challenge the court's conclusions regarding numerosity, typicality, or superiority; therefore, the court need not address them. *See Advance Am. Servicing of Ark., Inc. v. McGinnis,* 2009 Ark. 151, 300 S.W.3d 487.

held that, in order for a class-action suit to be certified, six factors must be met. Specifically, the party seeking certification must establish: (1) numerosity; (2) commonality; (3) predominance; (4) typicality; (5) superiority; and (6) adequacy. *Williamson v. Sanofi Winthrop Pharm., Inc.*, 347 Ark. 89, 60 S.W.3d 428 (2001).

Because Union Pacific first challenges the trial court's conclusions regarding commonality and predominance, we begin our analysis by setting out the tests for those two Rule 23 requirements. Rule 23(a)(2) of the Arkansas Rules of Civil Procedure requires a determination by the trial court that "there are questions of law or fact common to the class." *See also Williamson*, 347 Ark. at 96, 60 S.W.3d at 432. In *Williamson*, this court noted that, under our case law, this requirement is case-specific. *Id.* There, the court cited Professor Newberg's treatise on class actions as follows:

> [T]he common question prerequisite is interdependent with the notion of joinder impracticability under Rule 23(a)(1). Consideration of the common question issue requires an answer to the question: Common to whom?
>
> . . . .
>
> Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting the rule 23(a)(2) prerequisite is . . . that there need be only a single issue common to all members of the class. . . . When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.

*Id.* at 96, 60 S.W.3d at 432 (quoting Herbert B. Newberg, *Newberg on Class Actions* § 3.10 (3d ed. 1993)).

The *Williamson* court also noted that the circuit court "must determine what elements in a cause of action are common questions for the purpose of certifying a class." *Id.; see also BPS, Inc. v. Richardson*, 341 Ark. 834, 20 S.W.3d 403 (2000). In addition, we have said that commonality is satisfied where the "defendant's acts, independent of any action by the class members, establishes a common question relating to the entire class." *Williamson*, 347 Ark. at 97, 60 S.W.3d at 433.

Predominance is a more stringent requirement than commonality. *BPS, Inc., supra; Baker v. Wyeth–Ayerst Labs. Div.*, 338 Ark. 242, 992 S.W.2d 797 (1999) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). If there is a common question of law or fact, the court must then determine whether that common question predominates over questions that affect only individual members. Ark. R. Civ. P. 23(b); *Lenders Title Co. v. Chandler*, 358 Ark. 66, 186 S.W.3d 695 (2004); *BPS, Inc., supra*. The starting point for examination of this issue is whether a common wrong is alleged and whether a common question of law or fact exists in the case for all class members. *Lenders Title, supra*. If so, the next issue is whether the common question predominates over individual questions. *Id.*

When deciding whether common questions predominate over other questions affecting only individual members, this court does not merely compare the number of individual versus common claims. *Id.* Rather, this court decides if the preliminary, overarching issues common to all class members "predominate over" the individual issues, which can be resolved during the decertified stage of a bifurcated proceeding. *Id.* Thus, the mere fact that individual issues and de-

fenses may be raised regarding the recovery of individual members cannot defeat class certification where there are common questions concerning the defendant's alleged wrongdoing that must be resolved for all class members. *Id.; USA Check Cashers of Little Rock v. Island,* 349 Ark. 71, 76 S.W.3d 243 (2002).

■ We turn, then, to determining whether there was a common question of law or fact that predominated over individual issues in this case. The first question to be asked is whether there is at least one single issue common to all members of the class. In its first argument on appeal, Union Pacific contends that the issues that will determine the outcome of this case require individualized consideration and are thus unsuited for class treatment. Union Pacific frames the threshold issues in this case as being whether it engaged in unfair and inappropriate claims settlement practices by making oral misrepresentations, forming improper relationships of trust with the claimants, and omitting information that its claims representatives had a duty to disclose. Union Pacific contends that these issues require individualized examination of each settlement, which renders class treatment inappropriate.

Union Pacific further urges that the crux of the complaint is that the railroad improperly induced injured parties to settle for less than the true value of their claim. Therefore, each class member's claim depends on that party's individual, oral dealings with a Union Pacific claims representative. Union Pacific argues that, in each instance, the court must ask whether the claims agent misrepresented critical facts, omitted information, misled the claimant, or gave advice on which the claimant relied to his or her detriment. Union Pacific contends that these issues, which form the elements of the underlying cause of action, will be unique to every class member, and therefore, there is no one single issue that is common to every member.

The appellees respond that the underlying question is simply whether Union Pacific engaged in the unauthorized practice of law. They argue that the actions of the claims representatives in enticing the claimants to settle were undertaken as part of a "common scheme ... that is repeated time and time again." The appellees point to the deposition testimony of Herb Stuart, a retired Union Pacific claims director, who stated that "the claims department tries to develop relationships with claimants after these claims happen. It is our intention to develop [a] relationship of trust and confidence.... [T]he goal is to resolve the claim while the claimant is still unrepresented." Therefore, the appellees contend that, regardless of any individual questions that might arise, there is a common, predominant scheme or plan by which Union Pacific undertakes to settle potential claims in all such cases.

Further, the appellees argue that Union Pacific is essentially asking this court to examine the merits of each class member's claim, which is inappropriate at the class-certification stage. In *Williamson,* a case involving the commonality requirement of Rule 23, this court affirmed the circuit court's denial of class certification when the alleged "common wrong" was a purported contract between each individual class member and his or her employer, Sanofi–Winthrop. The basis of the complaint was that Sanofi–Winthrop had created an incentive program with its sales people and had promised to pay bonuses on the basis of the employees' performances. The named plaintiff, Williamson, argued that there were issues in common for each sales person, such as the fact that

they all qualified for the bonus program, they were all Sanofi–Winthrop employees, and none of them received payment under the program. *Williamson,* 347 Ark. at 93, 60 S.W.3d at 431.

However, this court pointed out that the underlying essence of the action was whether a contract had been formed when Sanofi–Winthrop offered the incentive program and whether each salesperson increased sales in response. The court explained that, although it is improper to examine the merits of the underlying lawsuit, "consideration of the elements of the underlying claim is important to determine whether any questions are common to the class and whether those questions will resolve the issue." *Id.* at 98, 60 S.W.3d at 433. This court concluded that one element of a contract—whether there had been a meeting of the minds such that a valid contract had been formed—required an individualized inquiry into each party's understanding of the terms of the alleged contract. *Id.* at 98, 60 S.W.3d at 434. "Therefore, before even reaching any common question about a *breach* of contract, each potential class member would have to establish the *existence* of a contract between himself and Sanofi.... This does not lend itself to a class action[.]" *Id.* at 97, 60 S.W.3d at 433 (emphasis added). Commonality was thus determined to be lacking.

In the present case, as noted above, the appellees argue that certification was proper because each class member's claims would be rooted in Union Pacific's common or uniform course of conduct in handling and settling injury and death claims. Union Pacific, however, responds that it had no uniform scheme or policy and that each claimant was treated individually; therefore, each claimant's case would have to be examined to determine whether a Union Pacific claims representative engaged in fraudulent or deceptive conduct that amounted to the unauthorized practice of law.

Union Pacific asserts that, in order to recover, the appellees must have the settlements and releases set aside; however, in order to do so, the appellees must prove that the releases were fraudulently obtained by the railroad's claims representatives. This, Union Pacific contends, would clearly involve an examination of the representations made to each individual class member, and answering the five questions certified as common by the circuit court would not resolve that question. *See Williamson,* 347 Ark. at 98, 60 S.W.3d at 433 (consideration of the elements of the underlying claim is important to determine whether any questions are common to the class and whether those questions will resolve the issue); *Mittry v. Bancorpsouth Bank,* 360 Ark. 249, 255 n. 3, 200 S.W.3d 869, 872 n. 3 (2005) (same).

The appellees, on the other hand, urge that it is unnecessary to set aside the settlements and releases, because they have an independent action based solely on the unauthorized practice of law, the elements of which are set out in *Arkansas Bar Ass'n v. Union National Bank of Little Rock,* 224 Ark. 48, 273 S.W.2d 408 (1954), and on the Arkansas Deceptive Trade Practices Act. As formulated by the appellees, the question is simply whether Union Pacific and its representatives engaged in actions that only a lawyer can perform; therefore, answering the questions certified as common by the trial court will directly resolve the issue.

■ There is thus some disagreement between the parties in this case over the elements of the underlying cause of action. It is not necessary to resolve this aspect of the commonality question, however, because even assuming there are questions that are common to all class members

and that would give rise to a cause of action, we conclude that it cannot be said that any such common issues predominate over individual ones. Class certification is inappropriate where there is "no one set of operative facts [that] establishes liability." *Baker v. Wyeth–Ayerst Labs. Div.*, 338 Ark. at 247, 992 S.W.2d at 800 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir.1988)); *see also Mittry v. Bancorpsouth Bank*, 360 Ark. 249, 200 S.W.3d 869 (2005).

The circuit court concluded that the five certified questions predominated over any individual issues, finding that there was an "overarching course of wrongful conduct by [Union Pacific] involving, *inter alia*, the selecting, filling-in, preparation, ... interpreting of legal documents, [and] giving legal advice and settling personal injury claims that predominates over individual considerations." In reaching this conclusion, the lower court relied on three of this court's opinions in which we held that claims concerning the unauthorized practice of law satisfied the predominance requirement of Rule 23: *Asbury Auto. Group, Inc. v. Palasack*, 366 Ark. 601, 237 S.W.3d 462 (2006); *Lenders Title Co. v. Chandler*, 358 Ark. 66, 186 S.W.3d 695 (2004); and *Am. Abstract & Title Co. v. Rice*, 358 Ark. 1, 186 S.W.3d 705 (2004).

In *Asbury Automotive*, the complaint alleged that Asbury Automotive Group charged a document preparation fee that amounted to the unauthorized practice of law. The circuit court certified a class of all individuals who had paid such a fee during a given time frame. On appeal, Asbury argued that the issue common to all class members did not predominate over individual issues, and that any determination of whether it had violated the ADTPA would require individualized inquiries because one element of the ADTPA would involve the question of whether each individual class member relied on a car dealer's allegedly deceptive conduct. *Asbury Auto.*, 366 Ark. at 610–11, 237 S.W.3d at 469. This court rejected the argument, concluding that the predominating questions concerned the charging of the fee and the basis for charging the fee. "These overarching issues can be resolved before the circuit court reaches any individual issues, such as the degree or reliance of each class member on the misrepresentation." *Id.* at 611, 237 S.W.3d at 469.

Similarly, in both *Lenders Title, supra*, and *American Abstract, supra*, class action lawsuits alleged that the title companies' practices of charging a fee for preparing legal documents amounted to the unauthorized practice of law. In *Lenders Title*, among the common, predominant questions of law established in the circuit court's order granting class certification were whether the filling in of blanks on a preprinted legal form constitute the practice of law, whether the practices of the title company violated the ADTPA, and whether the fee covered the preparation of legal documents or non-legal documents. Although Lenders Title asserted that these questions required individualized consideration for each class member, this court rejected the argument, concluding that the questions framed by the trial court were "clearly preliminary, threshold matters that must be decided before any individual issues can be considered." *Id.* at 78, 186 S.W.3d at 702. Because these questions were common, the fact that other individual issues existed could not be used to defeat class certification. *Id.*

In *American Abstract, supra*, the complaint also alleged that a title company had engaged in the unauthorized practice of law and had violated the ADTPA. There, the circuit court found that a common wrong had been alleged against American Abstract, and that the common issues pre-

dominated over any individual issues. *American Abstract,* 358 Ark. at 9, 186 S.W.3d at 710. On appeal, American Abstract argued that there were individual issues of reliance and damages, as well as questions regarding whether each class member sought legal advice and whether American Abstract had given legal advice. *Id.*

As in *Lenders Title, supra,* this court rejected those arguments, explaining that the "starting point in examining the predominance issue is whether a common wrong has been alleged against the defendant." *Id.* at 9–10, 186 S.W.3d at 710. The court noted that the "common wrong" was whether American Abstract had violated the ADTPA by the way it handled and charged document preparation fees for every member of the class. Despite American Abstract's argument that there were individual questions, such as whether and how much interest each class member's escrow account had earned, this court concluded that there were issues that were common to each member of the class that could be resolved before any of the individual issues. Therefore, the court held that the predominance element of Rule 23 had been satisfied. *Id.,* 186 S.W.3d at 710–11.

In each of these three cases, it was undisputed that the defendant had engaged in a uniform practice, such as charging a document preparation fee, with the class members; therefore, the question of whether that uniform practice constituted the unauthorized practice law clearly predominated over any individual issues. In the present case, the appellees complain that Union Pacific's practices in reaching settlements with and obtaining releases from injured individuals constituted the unauthorized practice of law. However, those practices varied from class member to class member. For example, probate documents were filed in connection with the settlement and release of claims in some cases but not in others, and the documents varied from case to case. At oral argument, counsel for the appellees conceded that such documents were filed in court for only approximately fifteen percent of the class members. In addition, the alleged common question of whether Union Pacific advised claimants of their legal rights will vary from person to person. Oral representations made to the plaintiffs by Union Pacific's claims representatives in order to broker a settlement would have been different in each case.

The appellees attempt to refute this point by citing the deposition testimony of Herb Stuart, a retired Union Pacific claims director, who stated that "the claims department tries to develop relationships with claimants after these claims happen. It is our intention to develop [a] relationship of trust and confidence.... [T]he goal is to resolve the claim while the claimant is still unrepresented." The appellees argue that Stuart's testimony supports a conclusion that Union Pacific's practices were the same with respect to every individual claimant.

However, while Stuart may have described Union Pacific's general *plan* or *goal* for handling claims, his testimony does not prove that there was a common *pattern* of facts in every case. To the contrary, Stuart also testified that, in evaluating cases, claims representatives would have to consider "various factors, including how the claimants will present themselves, potential expenses, the investigation, the relationship with the client, and other issues ... that might be important." He stated that "[e]ach case and the settlement amount will always be different because of the different facts and circumstances."

Clearly, there is "no one set of operative facts," *see Baker v. Wyeth–Ayerst,* 338

Ark. at 247, 992 S.W.2d at 800, that establishes Union Pacific's liability to any given class member. In *Baker*, the plaintiffs attempted to certify a class of individuals who had allegedly suffered injury after taking the "Fen–Phen" combination of diet drugs. The circuit court denied class certification, concluding that the plaintiffs all had different medical histories and conditions; different situations involving informed consent, prescription amounts, and duration of taking the drug; and different injuries and damages. This court affirmed the [20]denial of class certification, holding that "the only thing the plaintiffs have in common is that they all took one or a combination of the diet drugs listed in the complaint." *Baker*, 338 Ark. at 249, 992 S.W.2d at 801; *see also Mittry v. Bancorpsouth Bank, supra* (individualized questions concerning the defendant's responsibility for diminished sales prices of class members' bonds predominated over any common questions, rendering class certification inappropriate); *Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995) (where the only common issue was the fact that patients had the same kind of surgical implant, but where all other issues such as informed consent, proximate causation, and damages were different for every class member, common issues did not predominate).

Similarly, in the instant case, the only thing that all of the plaintiffs have in common is that they settled a claim against Union Pacific. In short, there is no "one set of operative facts" that may or may not have constituted the unauthorized practice of law or a violation of the ADTPA. Accordingly, we conclude that there is no common question of law or fact that pre-

dominates over the questions affecting only individual class members.

This court has noted that a trial court has broad discretion to allow or disallow an action to proceed as a class action. However, we have never held that a trial court's discretion is "so broad that it cannot be the subject of a proper review." *Arthur v. Zearley*, 320 Ark. at 289, 895 S.W.2d at 936–37. In this case, we hold that the circuit court abused [21]its discretion in certifying a class action, and we reverse and remand with instructions to decertify the class.[4]

Special Justice JENNIFER WILSON–HARVEY joins.

IMBER, J., dissents.

GUNTER, J., not participating.

**ANNABELLE CLINTON IMBER, Justice, dissenting.**

I respectfully dissent. In my view, the majority opinion fails to abide by two of our most strongly held principles of class-certification review: an abuse-of-discretion standard of review that is highly deferential to the circuit court's order, and a refusal to delve into the merits of the underlying claims. The result is a higher burden of proof than we have previously required in demonstrating predominance of common issues.

The majority acknowledges that, in reviewing a certification decision, it is "totally immaterial whether the petition will succeed on the merits or even if it states a cause of action." *Am. Abstract & Title Co. v. Rice*, 358 Ark. 1, 9, 186 S.W.3d 705, 710 (2004). Yet, the majority implies that this case is unsuitable for class treatment because Appellees have failed to prove that

---

**4.** Because we reverse on Union Pacific's first argument, we do not reach the remainder of the issues it raised on appeal.

Union Pacific acted in conformity with its stated plan for settling claims in every case. In fact, the majority makes a distinction between demonstrating the existence of a plan or scheme and proving that the plan was adhered to in every instance, suggesting that the former has been done while the latter has not. I submit that Appellees are not required to prove, at this stage, that similar representations were made in every settlement negotiation. They have demonstrated, through the deposition testimony of Herbert Stuart, former director of Union Pacific's claims department, that Union Pacific had developed a "consistent pattern and practice" for settling claims. This is sufficient for class certification.

More particularly, Stuart testified that the railroad had a pattern of meeting with potential claimants, usually within twenty-four to forty-eight hours of an accident, with the goal of resolving claims while the potential claimants were "still unrepresented" by legal counsel. In the negotiations, claims representatives attempted to establish relationships of trust and confidence with potential claimants and prepared settlement documents to be filed in court. Stuart further testified that the railroad had a consistent pattern and practice of not sharing information gathered in investigations unless specifically requested by the claimant. According to Stuart, the goal was to save money "in the area of the additional expenses, and the claim rep time, and the risk avoidance." Other evidence in the record establishes that claims representatives routinely discouraged potential claimants from employing legal counsel. Specifically, the proposed class representatives testified that they were told that "a lawyer wouldn't do you any good" and that "if you get a lawyer, you probably wouldn't ... get a certain amount ... because most of it would go to the lawyer's fee." Additionally, questionnaires completed by potential class members for purposes of the lawsuit showed that a number of potential claimants were told that they could not hire an attorney, that "it wouldn't do any good" to hire an attorney, and that an attorney would "get all the money." Some potential claimants believed that the Union Pacific claims representative with whom they negotiated was acting as their attorney. According to Stuart's deposition testimony, claims representatives clarified that they were not lawyers only when asked.

We have previously affirmed findings of predominance when the underlying allegations concerned an overall scheme and course of conduct. See, e.g., SEECO, Inc. v. Hales, 330 Ark. 402, 954 S.W.2d 234 (1997). In the SEECO case, plaintiffs asserted various claims rooted in an alleged failure to enforce the provisions of a gas-sales contract and sought damages on several theories, including fraud, breach of contract, and civil conspiracy. Id. at 404–06, 954 S.W.2d at 235–36. This court affirmed the trial court's grant of class certification, noting that the issue of a fraudulent scheme was "central" and "a common starting point for all class members." Id. at 412, 954 S.W.2d at 240. We held that "[t]he overarching issue which must be the starting point in the resolution of this matter relates to the existence of the alleged scheme." Id. at 414, 954 S.W.2d at 241 (emphasis added). The same may be said of the instant case. The overarching issue, which predominates over all others, is Appellees' allegation that Union Pacific's pattern and practice of settling claims amounted to the unauthorized practice of law and an ADTPA violation. In other words, it is the existence of the alleged scheme that is the starting point in the resolution of Appellees' claims against Union Pacific. Thus, the case involves "preliminary, common issues of liability and

wrongdoing that affect all class members," and the circuit court may subsequently resolve individual issues in bifurcated proceedings. *Gen. Motors Corp. v. Bryant,* 374 Ark. 38, 44, 285 S.W.3d 634, 639 (2008).

The majority also seems to suggest that class treatment is inappropriate because the question of whether Union Pacific engaged in uniform settlement practices is disputed. The opinion points to our decisions in *Lenders Title Co. v. Chandler,* 358 Ark. 66, 78, 186 S.W.3d 695, 702 (2004), and other similar cases, wherein the defendant's practice of charging a document preparation fee was characterized as "admitted." In my mind, this is a distinction without a difference. Like the defendants in *Lenders Title, American Abstract & Title Co. v. Rice, supra,* and *Asbury Automotive Group, Inc. v. Palasack,* 366 Ark. 601, 237 S.W.3d 462 (2006), Union Pacific has effectively admitted to a common plan. It only disputes the allegation that its claims representatives consistently adhered to this plan, and the majority seems to prematurely decide the merits of this dispute. To require Appellees at this stage to meet proof with proof and disprove Union Pacific's assertion that it did not consistently adhere to a plan is to engage in a premature merits determination. We have repeatedly refused to impose such a burden at this early stage.

The majority opinion quotes from our decision in *Baker v. Wyeth–Ayerst Laboratories Division,* 338 Ark. 242, 247, 992 S.W.2d 797, 800 (1999), in holding that "no one set of operative facts" establishes Union Pacific's liability. Interestingly, that quote originated from a discussion in a Sixth Circuit opinion addressing the complexity of individual issues presented by toxic-tort and products-liability cases as opposed to mass-accident cases, where injuries are caused by a single catastrophic event occurring at one time and place.

*See Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988). The Sixth Circuit held in *Sterling* that, "[i]n complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy." *Id.* at 1197. These types of cases were distinguished from mass-accident cases, where "the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs." *Id.* The language was quoted in *Baker* for the same proposition, and we noted that "we have been more inclined to approve class certification in mass-accident cases than in products-liability or toxic-tort cases." 338 Ark. at 247, 992 S.W.2d at 800. Outside of that framework, we have been decidedly more flexible than the federal courts, holding that issues of causation will not bar a finding of predominance and that, in determining predominance, we do not merely compare the number of individual versus common issues. *Gen. Motors Corp. v. Bryant, supra.*

Finally, and most importantly, I cannot agree with the majority's conclusion that the circuit court's order in this case amounted to an abuse of discretion. It is telling that the cases relied upon in the majority opinion are those in which we have affirmed a circuit court's denial of class certification. *See Mittry v. Bancorpsouth Bank,* 360 Ark. 249, 200 S.W.3d 869 (2005); *Williamson v. Sanofi Winthrop Pharm., Inc.,* 347 Ark. 89, 60 S.W.3d 428 (2001); *Baker v. Wyeth–Ayerst Labs. Div., supra.* Under our abuse-of-discretion standard of review, reversing a grant of class certification is another matter altogether. We took special care in *Williamson v. Sanofi Winthrop Pharmaceuticals,*

*Inc.,* to point out that "this court reviews class-action certifications or denials under an abuse-of-discretion standard, and we will not reverse the trial court's decision unless the appellant can demonstrate that the court abused its discretion in reaching its decision." 347 Ark. at 101, 60 S.W.3d at 436. However, because we could not say that the trial court had abused its discretion in denying class certification, we affirmed the denial. *Id.* I cannot say that the circuit court in the instant case abused its discretion in granting class certification, and I believe that the majority errs in engaging in a merits analysis to reach the conclusion that it did. For these reasons, I must dissent.